**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                 No. CR 21-0270 JB

JORGE ALBERTO AREVALO-
CONTRERAS,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant's Motion for Downward

Departure or Variance and Sentencing Memorandum, filed July 1, 2021 (Doc. 25)("Objections").

The Court held a hearing on August 3, 2021.  See Notice of Sentencing, filed July 27, 2021 (Doc.

28). The primary issues are whether: (i) the Court should reduce Defendant Jorge Alberto Arevalo-

Contreras' Criminal History Category from IV to II, where Arevalo-Contreras sustained two

violent felony convictions at age eighteen -- twelve years ago -- that impact significantly his

criminal history score; (ii) whether the Court should conclude that the United States Sentencing

Guidelines ("U.S.S.G.") § 2L1.2(b)(2) does not enhance validly Arevalo-Contreras' sentence,

where Arevalo-Contreras argues that the enhancement is invalid under Kimbrough v.  United

States, 552 U.S.  85 (2007), and inappropriately enhances his sentence based on an offense

included already in his criminal history score calculation; (iii) whether the Court should depart

downward on the basis of cultural assimilation, where Arevalo-Contreras' family resides in the

United States; (iv) whether the Court should depart downward because of Arevalo-Contreras' age,

where Arevalo-Contreras is thirty years old; and (v) what sentence would be sufficient, but not

greater than necessary, to satisfy the factors listed in 18 U.S.C. § 3553(a).  The Court concludes

that: (i) the Court will not reduce Arevalo-Contreras' criminal history score, because his criminal history score correctly represents both his past crimes and his likelihood of reoffending in the future; (ii) the U.S.S.G. § 2L1.2(b)(2) enhancement is valid, because both the Guidelines and the United States Court of Appeals for the Tenth Circuit have authorized district courts' use of prior convictions to calculate a sentence enhancement and a defendant's criminal history category, and because the Sentencing Commission considered both public comment and empirical research when it updated most recently U.S.S.G. § 2L1.2, in 2018; (iii) the Court will not depart downward because of cultural assimilation under Application Note 8 to U.S.S.G. § 2L1.2, because, although Arevalo-Contreras has significant ties to the United States, he did not return to the United States because of his ties here, but rather returned because of his fear of the Mexican cartel, and because lowering Arevalo-Contreras' sentence would endanger the American public; (iv) a downward departure because of Arevalo-Contreras' age is inappropriate here, because Arevalo-Contreras is neither elderly nor infirm, but, instead, is young and in good health, and is likely to reoffend; and (v) a sentence of 37 months, which is  a high end Guideline range is 30 to 37 months, is sufficient, but not greater than necessary, to satisfy the factors listed in 18 U.S.C. § 3553(a), given that Arevalo-Contreras has twice re-entered the country following deportations and continued to engage in criminal activity until his arrest for the underlying offense.  The Court, therefore, overrules the Objections and sentences Arevalo-Contreras to 37 months.

## **FINDINGS OF FACT**

The Court takes its facts from the Presentence Investigative Report, filed June 16, 2021 (Doc. 23)("PSR") and from evidence the United States submitted, see Notice of Lodging, filed August 18, 2021 (Doc. 34).

1.     Arevalo-Contreras pled guilty to "Reentry of a Removed Alien" under

8 U.S.C. § 1326.  PSR ¶ 11, at 4.

2.      Arevalo-Contreras had been convicted of three crimes as a juvenile and three crimes as an adult before committing the offense at issue here.  See PSR ¶¶ 23-28, at 5-7.

**1.      Arevalo-Contreras' Early Life.**

3.      Arevalo-Contreras was born in Chihuahua, Mexico, in 1991.  See PSR ¶ 37, at 8.

4.      During his childhood, he did not experience abuse and had "frequent contact with his parents."  PSR ¶ 37, at 8.

5.      Arevalo-Contreras has two older brothers and one younger sister, all of whom reside currently in Albuquerque, New Mexico.  See PSR ¶ 37, at 8.

6.      Arevalo-Contreras moved to Albuquerque when he was "around eight or nine years old."  PSR ¶ 37, at 8.

7.      Upon arriving in Albuquerque, Arevalo-Contreras attended School on Wheels Alternative School.  See PSR ¶ 48, at 10.

8.      Arevalo-Contreras dropped out of school "in the ninth grade because he had to earn money for his household as his mother was struggling to pay the bills."   PSR ¶ 48, at 10.

**2.      Arevalo-Contreras' Criminal History and Adult Life.**

9.      At age sixteen, Arevalo-Contreras was convicted of his first crime -- possessing less than one ounce of marijuana.  See PSR ¶ 23, at 5.

10.     When police officers approached Arevalo-Contreras, he "threw an object over the fence nearby."  PSR ¶ 23, at 5.

11.     The bag contained marijuana and cocaine.  See PSR ¶ 23, at 5.

12.     Arevalo-Contreras received a suspended sentence of six months for the marijuana possession offense.  See PSR ¶ 23, at 5.

13.    Then, at age seventeen, on February 19, 2009, Arevalo-Contreras was convicted of: (i) shooting at or from a motor vehicle (causing injury); and (ii) unlawful possession of a handgun by a minor.  See PSR ¶¶ 24-25, at 5-6.

14.    Officers discovered the handgun possession during a traffic stop, during which "they noticed the defendant in the back seat attempting to conceal something."  PSR ¶ 25, at 6.

15.    After removing the car's occupants, officers saw "a firearm in the backseat where the defendant was seated.  Further investigation revealed the firearm was stolen and all subjects in the vehicle denied ownership."  PSR ¶ 25, at 6.

16.    For both crimes, Arevalo-Contreras received an "indeterminate sentence not to exceed 2 years custody."  PSR ¶¶ 24-25, at 5-6.

17.    Excluding the offense at issue here, Arevalo-Contreras has been convicted of three crimes as an adult.  See PSR ¶¶ 26-28, at 6-7.

18.    First, Arevalo-Contreras was convicted of aggravated battery resulting in great bodily harm.  See PSR ¶ 26, at 6.

19.    Second, Arevalo-Contreras was convicted of battery upon a peace officer.  See PSR ¶ 27, at 6-7.

20.    Arevalo-Contreras "struck" a "youth care specialist . . . during a physical confrontation . . . while the defendant was in the custody of the Youth Diagnostic Development Center . . . ."  PSR ¶ 27, at 6-7.

21.    For this offense, Arevalo-Contreras was sentenced to eighteen months in custody, eighteen months of unsupervised probation, and two years of parole.  See PSR ¶ 27, at 6.

22.    Arevalo-Contreras has been a member of the Juaritos Maravilla gang.  See PSR ¶ 68, at 13.

23.     Third, Arevalo-Contreras was convicted of reentry of a removed alien.  <u>See</u> PSR ¶ 28, at 7.

24.     Following his sentence for his second offense, Arevalo-Contreras was deported on February 15, 2011.  <u>See</u> PSR ¶ 27, at 6.

25.     While in Mexico, Arevalo-Contreras worked in construction.  <u>See</u> PSR ¶ 49, at 11.

26.     The Mexican cartel also kidnapped and tortured Arevalo-Contreras following his deportation.  <u>See</u> PSR ¶ 40, at 8-9.

27.     Members of the cartel "burned him, electrocuted him, pulled his nails off, and threatened to kill him."  PSR ¶ 40, at 8-9.

28.     After his escape from the cartel, Arevalo-Contreras attempted to re-enter the United States on November 17, 2013.  <u>See</u> PSR ¶ 28, at 7.

29.     Border patrol agents discovered Arevalo-Contreras "riding in a vehicle crossing through a checkpoint on the Interstate."  PSR ¶ 28, at 7.

30.     Arevalo-Contreras was "attempting to conceal himself in a large luggage bag."  PSR ¶ 28, at 7.

31.     Arevalo-Contreras was convicted of reentry of a removed alien on November 12, 2014, and the Honorable Kenneth Gonzales, United States District Judge for the United States District Court for the District of New Mexico, sentenced him to 70 months of incarceration.  <u>See</u> PSR ¶ 28, at 7.[1]

32.     After serving this sentence, Arevalo-Contreras was again deported on April 2, 2019.  <u>See</u> PSR ¶ 28, at 7.

---

[1]The Court has determined that 70 months was the bottom of the Guideline range at that time.

3.     **Arevalo-Contreras' Second Illegal Reentry.**

33.     When Arevalo-Contreras illegally reentered the United States in 2019, he began working at a roofing company in Albuquerque.  See PSR ¶ 49, at 10.

34.     Then, in January, 2020, Arevalo-Contreras began operating an auto-detailing business from his home in Albuquerque.  See PSR ¶ 49, at 10.

35.     On January 3, 2020, and on February 16, 2020, Arevalo-Contreras made Facebook posts demonstrating that he remains a Juaritos Maravilla gang member:





Facebook 8, filed August 18, 2021 (Doc. 34)(showing an older photograph of men making the Juaritos Maravilla gang sign, while in the comments to the photo Arevalo-Contreras and other men pose recreating the same sign); Facebook 6, filed August 18, 2021 (Doc. 34).

36.     On March 8, 2020, Arevalo-Contreras married his current wife, Angel Arevalo. See PSR ¶ 42, at 9.

37.     Then, on June 15, 2020, Arevalo-Contreras posted a photograph of a black semi-automatic pistol and a loaded magazine on his Facebook page:



Facebook-4, filed August 18, 2021 (Doc. 34)(showing the conversation between Arevalo-Contreras and another Facebook user in Spanish).

38.     Another Facebook user commented on the photograph, in Spanish: "I'm going to sell you one like this."  Affidavit in Support of An Application for a Search Warrant ¶ 13, at 9 (dated Aug. 18, 2020), filed August 18, 2021 (Doc. 34)("FBI Report").

39.     Arevalo Contreras replied, "how much message inbox???," indicating that he wished to purchase the firearm.  FBI Report ¶ 13, at 9.

40.     Next, on June 22, 2020, Arevalo-Contreras posted a photograph on his Facebook page in which Arevalo-Contreras was holding a pump-action shotgun and a revolver, and A. Arevalo was holding a semi-automatic pistol:



Facebook A, filed August 18, 2021 (Doc. 34).

     41.    The photograph's date and time stamp demonstrate that the photograph was taken on June 14, 2020 at 3:20 p.m.  See Facebook A.

     42.    On the same day, Arevalo-Contreras posted a video in which he "simultaneously fired two handguns multiple times at a piece of concrete":



FBI Report ¶ 15, at 8-9; 19.

43.     Also on Arevalo-Contreras' Facebook page, his profile picture is a photograph of

he and A. Arevalo holding firearms, and his cover photograph is another firearm:





Facebook 1, filed August 18, 2021 (Doc. 34).[2]

44.     Arevalo-Contreras also was the subject of a popular Youtube video released in July,

2020.  See From Juarez to Albuquerque, New Mexico || Part 1: Duke City Living at 2:33 Youtube

(July 27, 2020), https://www.youtube.com/watch?v=lCPvmtqg8KU ("Juarez to Albuquerque").

_____

[2]Arevalo-Contreras' Facebook name is Conejo Loco; his nickname is Conejo.  See
Facebook 1.

In the video, Arevalo-Contreras is holding a gun, despite his status as a felon:



See Screenshot5, filed August 18, 2021 (Doc. 34); Juarez to Albuquerque at 2:30.

      45.    Also in the video, a handgun can be seen protruding from Arevalo-Contreras'
waistband:



Part 2_1, filed August 18, 2021 (Doc. 34).

46.     Arevalo-Contreras indicates in the video that, since he returned to Albuquerque in 2019, he has sold drugs.  See Juarez to Albuquerque ("I came back to Albuquerque, I started . . . receiving dope . . . .  I remember I used to sell crack and my homie used to hook me up.").

47.     Then, on August 11, 2020, Arevalo-Contreras sold methamphetamine and offered to sell suboxone strips[3] to an anonymous individual whom the FBI interviewed.

48.     Subsequently, "[o]n August 13, 2020, a special agent with the Federal Bureau of Investigations ('FBI') contacted a deportation officer regarding the defendant being present in Albuquerque and he was suspected of being in the United States unlawfully."  PSR ¶ 5, at 3.

49.     "The deportation officer had the FBI agent positively identify the defendant."  PSR ¶ 5, at 3.

50.     "An arrest warrant was issued for the defendant on August 14, 2020.  The warrant was executed on September 11, 2020, in Denver, Colorado."  PSR ¶ 5, at 3.

51.     Arevalo-Contreras and A. Arevalo were expecting a child, but A. Arevalo "lost the baby the day" Arevalo-Contreras "was arrested for the instant offense."  PSR ¶ 42, at 9.

## PROCEDURAL BACKGROUND

Arevalo-Contreras objects to the United States Probation Office's ("USPO") calculation of his offense level and criminal history score.  See Objections at 1-2.  Plaintiff United States of America supports the USPO's calculations.  See United States' Response to Defendant's Request for Downward Departure or Variance and Sentencing Memorandum at 1, filed July 15, 2021 (Doc.

---

[3]"Suboxone strips are prescribed, sublingual strips used to treat opioid addictions. They are commonly used and sold illegally as an inexpensive substitute to heroin."  FBI Report ¶ 19, at 11 n.4.

27)("Response").  The USPO addresses one of the Objections, but does not change its position.

<u>See</u> Addendum to Presentence Investigative Report at 1-2, filed July 28, 2021 (Doc.

30)("Addendum").

   1.   **<u>The PSR</u>.**

First, the USPO calculates a total offense level of 15.  <u>See</u> PSR ¶ 21, at 4.  The USPO notes

that the base offense level is 8.  <u>See</u> PSR ¶ 11, at 4 (citing 8 U.S.C. §§ 1326(a)-(b) and U.S.S.G.

§ 2L1.2(a)).   The USPO applies a 4-level offense enhancement, because Arevalo-Contreras

"committed the instant offense after sustaining a conviction for a felony illegal reentry offense."

PSR ¶ 12, at 4 (citing U.S.S.G. § 2L1.2(b)(1)(A)).  Then, the USPO applies a 6-level offense

enhancement, because, before Arevalo-Contreras "was ordered deported from the United States

for the first time, the defendant was convicted for a felony offense (other than an illegal reentry

offense)."  PSR ¶ 13, at 4 (citing U.S.S.G. § 2L1.2(b)(2)(C)).   The USPO then subtracts 3 offense

levels for acceptance of responsibility.  <u>See</u> PSR ¶¶ 19-20, at 4.

Second, the USPO calculates Arevalo-Contreras' criminal history score.  <u>See</u> PSR ¶¶ 29-

30, at 7.  The USPO does not add any points for Arevalo-Contreras' juvenile offenses or for his

arrests that do not result in convictions.  <u>See</u> PSR ¶¶ 23-25, at 5-6.  Arevalo-Contreras then receives

3 points each for the following offenses: (i) "Aggravated Battery (Great Bodily Harm)," PSR ¶ 26,

at 6; (ii) "Battery Upon a Peace Officer," PSR ¶ 27, at 6; and (iii) "Reentry of a Removed Alien,"

PSR ¶ 28, at 7, for a total of 9 points.  The USPO then explains that "a criminal history score of

nine establishes a criminal history category of IV."  PSR ¶ 30, at 7.  Given the offense level of 15

and the Criminal History Category of IV, the USPO calculates a Guideline imprisonment range of

30 months to 37 months.  <u>See</u> PSR ¶ 53, at 11.

2.      **The Objections.**

Arevalo Contreras asks the Court to "grant a downward departure or variance and sentence

him to a term of imprisonment of 18 months."  Objections at 1.  Arevalo-Contreras explains his

rationale for seeking the lower sentence:

> Mr. Arevalo-Contreras respectfully suggests that criminal history category
> IV over-represents his criminal history under U.S.S.G. § 4A1.3(b)(1) and
> exaggerates the seriousness of the prior offense under Application Note 6 to
> U.S.S.G. § 2L1.2.  Criminal history category II is more appropriate.  This would
> bring Mr. Arevalo-Contreras sentencing range to 21-27 months, a sentence still
> greater than necessary to comply with the parsimony provision of
> 18 U.S.C. § 3553(a).  Mr. Arevalo-Contreras therefore requests that the Court find
> that offense level 15 over-represents the seriousness of the prior offense and grant
> a 1-level departure or variance to offense level 14.  A criminal history category of
> II and an offense level of 14 results in an advisory guideline range of 18-24 months.
> Based on his history and characteristics, including his age and cultural assimilation,
> Mr. Arevalo-Contreras respectfully requests a sentence of 18 months, the low end
> of the resulting advisory guideline range

Objections at 2.  Arevalo-Contreras asserts that his criminal history is overrepresented, because

"[a]ll of Mr. Arevalo-Contreras's criminal history except for his immigration conviction in 2013

occurred in a short period when he was young."  Objections at 3.  Arevalo-Contreras urges the

Court to consider the age of Arevalo-Contreras' prior convictions.  See Objections at 4 (citing

United States v. Fletcher, 15 F.3d 553, 557 (6th Cir. 1994)).  Arevalo-Contreras argues that, if the

Court ignores convictions from when Arevalo-Contreras was eighteen, he would receive a

Criminal History Category of II, which, he insists, represents accurately his criminal history.  See

Objections at 4.  Arevalo-Contreras insists that "two dreadful mistakes, months from one another,

at such an early age from so long ago should not lead to such a draconian enhancement."

Objections at 4.

Arevalo-Contreras then asks the Court to refuse to apply the enhancement under U.S.S.G.

§ 2L1.2(b)(2), because, he notes, the "prior conviction is already counted in the criminal history

score." Objections at 4.  Arevalo-Contreras also criticizes § 2L1.2(b)(2) for being overly punitive.

See Objections at 4-5 (citing United States v. Zapata-Trevino, 378 F. Supp. 2d 1321, 1328 (D.N.M.

2005)(Vazquez, C.J., and United States v. Galvez-Barrios, 355 F. Supp. 2d 958, 961 (E.D. Wis.

2005)(Adelman, J.)).  Arevalo-Contreras emphasizes that "'[i]t has been observed by even strong

defenders of the guidelines that the sentencing ranges called for under the guidelines for unlawful

re-entry are often unreasonably harsh and disproportionate to the seriousness of the offense.'"

Objections at 5-6 (quoting United States v. Reyes-Hernandez, 624 F.3d 405, 420-21 (7th Cir.

2010)).  Arevalo-Contreras also asserts that § 2L1.2(b)(2) is not based on empirical evidence.  See

Objections at 6.  Arevalo-Contreras argues that, instead, "changes in the guideline was in response

to Congressional directive and complaints from practitioners."  Objections at 6.  Arevalo-Contreras

continues that, under  § 3553(a), § 2L1.2 "results in a substantively unreasonable sentence,"

because it results in a sentence greater than necessary to achieve § 3553(a)'s objectives.

Objections at 7.  Arevalo-Contreras explains that, "for the same reasons that Mr. Arevalo-

Contreras's criminal history is over-represented, so too is the 10-level enhancement unreasonable."

Objections at 7.

Arevalo-Contreras then requests a departure based on cultural assimilation under

Application Note 8 to U.S.S.G. § 2L1.2.  See Objections at 7-8.  Arevalo-Contreras asserts that

the following factors weigh in favor of granting this departure:

> Mr. Arevalo-Contreras has lived most of his life in the United States.  Mr. Arevalo-
> Contreras forged strong ties with this country as he grew up and was educated here.
> His siblings all reside in the United States.  His mother resides in Albuquerque,
> New Mexico.  His wife and her family also live in Albuquerque.

Objections at 8.  Arevalo-Contreras also notes that, even if the Court does not grant a downward

departure on cultural assimilation grounds, it still can grant a downward variance because of

cultural assimilation.  See Objections at 8-9 (citing United States v. Luevano-Sanchez, No. CR 16-3648 JB, 2017 WL 3054519, at *12 (D.N.M. July 18, 2017)(Browning, J.).  Arevalo-Contreras insists that he is also eligible for a downward departure or variance under U.S.S.G. § 5H1.1, because he "is less likely to recidivate because of his age."  Objections at 9.

Arevalo-Contreras then discusses the § 3553(a) factors in detail and reiterates his request for an 18-month sentence.  See Objections at 10-11.  Arevalo-Contreras notes that his offense is non-violent and that "his motive was to be with his family."  Objections at 10.  He contends that an 18-month sentence "satisfies the need for a sentence to reflect the seriousness of the crime, deter future criminal conduct, prevent the defendant from committing more crimes, and provide rehabilitation."  Objections at 11.  Arevalo-Contreras states his intention to apply for asylum, but admits that, if he is not granted asylum, he "is well aware that he must spend the rest of his life in Mexico, where he will not be a danger to anyone in the United States."  Objections at 10.  Arevalo-Contreras concludes that, in his case,  a "sentence of 18 months would satisfy the need to avoid unwarranted sentence disparities."  Objections at 11 (citing United States v. Davis, 437 F.3d 989, 997 (10th Cir. 2006)).

     **3.**     **The Response**.

The United States responds to the Objections.  See Response at 1.  The United States asks the Court "to deny the defendant's request for downward variance or departure and sentence the defendant to the high end of the applicable guidelines range."  Response at 1.  The United States asks the Court to order a 37-month sentence and "a period of supervised release."  Response at 1.  The United States argues that Arevalo-Contreras' convictions at eighteen "are not mere aberrations, but indicators of how he would continue to conduct himself."  Response at 3.  The United States notes that Arevalo-Contreras "has continued to live life as an unapologetic gang

member who sells drugs and carries a firearm." Response at 3.

The United States next addresses Arevalo-Contreras' argument that U.S.S.G. § 2L1.2 inflates his offense level. See Response at 4. The United States insists that "the caselaw clearly states this is permissible." Response at 4 (citing United States v. Soto-Lopez, 513 F. App'x 746, 749 (10th Cir. 2013)). The United States contends that the Guideline range of 30 to 37 months is reasonable, considering Arevalo-Contreras' criminal history, and considering that his "last reentry conviction . . . was a custodial sentence of 70 months." Response at 4.

The United States then discusses Arevalo-Contreras' request for a downward departure based on cultural assimilation. See Response at 4-5. The United States insists that membership in the Juaritos Maravilla gang "is not the type of cultural assimilation anticipated by the Guidelines." Response at 5. The United States notes that, in addition to his gang membership, Arevalo-Contreras recently has been filmed carrying a firearm and discussing dealing drugs. See Response at 5. Although the United States admits that Arevalo-Contreras has resided in the United States from a young age, it emphasizes that Arevalo-Contreras also has "been involved in crime from a young age." Response at 5. The United States argues that the Court should not depart or vary downward based on Arevalo-Contreras' age, because he "has been a grown man for several years and has not grown out of criminal activity. There is no reason to believe that age thirty-one is the magic number for the defendant to age out of his criminal behavior." Response at 5.

The United States then asks the Court not to vary downward, because, although Arevalo-Contreras' offense is nonviolent, "those that are then violent in the United States once they reenter should not face a watered-down penalty when they are caught." Response at 5. The United States contends that Arevalo-Contreras' history and characteristics counsel against varying downward, because, the United States insists, Arevalo-Contreras "is not a law-abiding citizen who goes to

work every day and contributes to American society.  He is a dangerous gang member who has adopted such behavior as his lifestyle.  He sells drugs, he carries a gun, and he has no regard for the laws of the United States." Response at 6.  The United States maintains that a sentence at the high end of the Guideline range is necessary to promote respect for the law and deter Arevalo-Contreras from reoffending, given that he re-offended shortly after completing his previous seventy-month sentence for illegal reentry.  See Response at 7.  The United States admits that, "[a]rguably, a shorter 37-month sentence will not deter him either, but those are the applicable guidelines." Response at 7.  The United States then argues that a "sentence within the Guideline range is the best approach to preventing unwarranted sentencing disparities between similarly situated defendants." Response at 7.  The United States concludes by asking the Court to hold "that a sentence of 37 months and three years of supervised release would constitute a reasonable sentence, and deny the defendant's requests for a downward departure and a downward variance." Response at 7.

### 4.    **The Addendum.**

The USPO filed an Addendum to the PSR addressing Arevalo-Contreras' Objections.  See an Addendum at 1. The USPO maintains its position on Arevalo-Contreras' criminal history category. Addendum at 1.  The USPO insists that it calculated correctly Arevalo-Contreras' criminal history score, and emphasizes that "[t]wo of the defendant's adult convictions involve violence, and two of the juvenile adjudications involve firearms.  Additionally, the defendant has other arrests in which the dispositions are unknown." Addendum at 1.  The USPO concludes that "it does not appear a criminal history category of IV overrepresents his criminal history, and it does not appear a downward departure pursuant to USSG § 4A1.2(b)(1) is warranted." Addendum at 1.  The USPO does not address Arevalo-Contreras' other Objections.  See Addendum at 1-2.

5.    **The Sentencing Hearing**.

The Court began the sentencing hearing by asking Arevalo-Contreras whether he would prefer to argue his Objections first or whether he would prefer to hear the Court's preliminary thoughts about his Objections.  <u>See</u> Tr. at 4:2-11 (Court).  Arevalo-Contreras asked the Court to share its thoughts on his Objections first.  <u>See</u> Tr. at 4:12-15 (Langdell).  The Court explained in detail why it considers the offense level enhancements under U.S.S.G. § 2L1.2 are proper.  <u>See</u> Tr. at 4:15-11:23 (Court).  Both the United States and Arevalo-Contreras indicated that they had nothing further to say on the U.S.S.G. § 2L1.2 issue, and rested on their briefing.  <u>See</u> Tr. at 11:19-12:3 (Court, Langell, Simms).

The Court next explained why it would not depart on cultural assimilation grounds.  <u>See</u> Tr. at 13:16-21:6 (Court).  Arevalo-Contreras responded that he has significant ties in the United States: "A significant portion of his childhood was here in the United States.  His mother, father, siblings all reside here.  This is the country he knew as a child, where he went to school."  Tr. at 21:7-13 (Langell).  Arevalo-Contreras continued that, although he returned to the United States "because he was being threatened in Mexico and was tortured," he also "returned because of his family ties here in the United States."  Tr. at 21:13-16 (Langell).  Arevalo-Contreras admitted his gang involvement, but insisted that he "has turned his life around and has moved away from that life."  Tr. at 21:20-22 (Langell).

Arevalo-Contreras next addressed the argument that the Court should decrease his Criminal History Score from IV to II.  <u>See</u> Tr. at 23:6-10 (Langell).  Arevalo-Contreras noted that his violent felony convictions occurred while he was residing in the Youth Diagnostic and Development Center in Albuquerque, and that he was "still a juvenile in many ways, these convictions are quite old . . . ."  Tr. at 23:11-17 (Langell).  Arevalo-Contreras informed the Court that the United States

did not offer him a plea deal and, therefore, he was "left with one choice: to plead to the indictment without a plea agreement." Tr. at 24:8-18 (Langell). The United States replied that Arevalo-Contreras' criminal history score does not overrepresent his criminal record and insisted that Arevalo-Contreras' Guideline range "just isn't that long, and it's actually on the short side for the type of person we're looking at here." Tr. at 25:10-17 (Simms). The United States emphasized that Arevalo-Contreras' current lifestyle is not that of a reformed individual:

> His argument that . . . the points that he got when he was age 18 and any argument that well maybe he's aged out of this, that would hold more water if we weren't looking at this video on YouTube of his general life as a gangbanger who sells drugs and has firearms. Now, I do have an FBI agent witness with me if the Court would like to hear from him. But I would proffer to the Court that when . . . Mr. Arevalo-Contreras was arrested in Denver, he had a stolen firearm with him. . . . Prior to the defendant traveling to Colorado, there was a search warrant for his home . . . . The FBI had a search warrant for that home and they were looking for guns and drugs, and when they served the search warrant, he had fled to Colorado. . . . I think the plausible inference is that he knew that they were going to find him and he left. When he was pulled over, driving the same car that was observed at the residence that the FBI had the search warrant for, he had a stolen firearm. So I think the underrepresentation argument would be well taken if he had . . . straightened up and was a law-abiding citizen, you could say this looks worse than it really is -- but we don't have that here.

Tr. at 25:17-26:24 (Simms). Accordingly, the United States asked the Court to "deny that request as far as any variance based on overrepresentation of the criminal history." Tr. at 26:25-27:2 (Simms).

Arevalo-Contreras then discussed generally his request for an 18-month sentence. See Tr. at 20:11-25 (Langell). Arevalo-Contreras noted that the Court has received letters of support from his family and emphasized that he "does have significant family support." Tr. at 29:11-15 (Langell). Arevalo-Contreras contended that, had the United States offered a "fast track plea agreement," which "would have been appropriate in this case . . . that would have put his Guideline range at 24 to 30 months." Tr. at 29:21-24 (Langell). Arevalo-Contreras declined to "delve into

the contents of that video." Tr. at 30:2-3 (Langell).  Arevalo-Contreras emphasized that, although

he wished to stay in the United States, he understands that "his chances of remaining the United

States are very slim."  Tr. at 30:9-11 (Langell).

Arevalo-Contreras, speaking on his own behalf, asserted that "everything that was shown

and said on the video was when I was a juvenile."  Tr. at 31:1-3 (Arevalo-Contreras).  Arevalo-

Contreras maintained that he has changed his life, become a Christian, and has n married.  See Tr.

at 31:13-17 (Arevalo-Contreras).  Arevalo-Contreras noted that he had not committed any further

crimes while incarcerated.  See Tr. at 32:12-23 (Arevalo-Contreras).  Arevalo-Contreras insisted

that he "was just a little kid when I did all that stuff, now, I'm a grown man and I want to . . . be

able be a father" and "build a business."  Tr. at 33:4-12 (Arevalo-Contreras).  Arevalo-Contreras

apologized for returning to the United States, explaining that he planned to apply for asylum and

was "desperate to get away" from the Mexican cartel.  Tr. at 34:9-17 (Arevalo-Contreras).

The United States refuted Arevalo-Contreras' characterization of events and asserted that

he has not abided by the law since he returned to the United States in 2019.  See Tr. at 35:24-36:12

(Simms).  First, the United States noted: "The FBI observed him on August 11, 2020 . . . engaged

in a hand to hand drug transaction.  They did pull over the person that they observed him with and

that individual said that they basically bought Suboxone strips from him."  Tr. at 36:1-5 (Simms).

Second, the United States submitted that "on June 15, 2020 it appears he posted a photograph of a

black semi-automatic pistol  and a loaded magazine," and was attempting to purchase another gun

via Facebook.  Tr. at 36:13-18 (Simms).  Third, the United States asserted that, "on June 22, 2020,

he posted a picture of himself and his wife . . . and an unidentified male" in which both Arevalo-

Contreras and his wife were carrying firearms.  Tr. at 36:18-24 (Simms).  Fourth, the United States

contended that the surveillance on Arevalo-Contreras' house revealed that he remains "clearly, a

dedicated Juaritos Maravilla gang member." Tr. at 37:7-8 (Simms). The United States maintained that Arevalo-Contreras is "on the more serious side, if you had a sliding scale of illegal reentry felon in possession cases." Tr. at 38:20-23 (Simms). The United States concluded that a sentence at the high end of the Guideline range is necessary, because he "is going to be deported, going to come back here, let's give as much breathing room as we can between now and that time." Tr. at 39:5-8 (Simms).

The Court adopted the PSR, noted that the Guideline range was 30 to 37 months, and sentenced Arevalo-Contreras to 37 months. See Tr. at 42:25-43:5 (Simms). The Court noted that the sentence "is sufficient without being greater than is necessary to comply with the purposes of punishment set forth in the sentencing reform act." Tr. at 43:2-4 (Court). The Court recommended that "Immigration and Customs begin removal proceedings during service of sentence." Tr. at 43:10-13 (Court).

## LAW REGARDING DOWNWARD DEPARTURE BASED UPON CULTURAL ASSIMILATION

In United States v. Serrata, 425 F.3d 886 (10th Cir. 2005), the United States Court of Appeals for the Tenth Circuit considered whether the district court abused its discretion in using a family-circumstances departure under U.S.S.G. § 5K2.0 to adjust the defendants' Guidelines sentences. See 425 F.3d at 911. The Tenth Circuit articulated the standard it would use in its review.

This standard includes the following inquiries:

> (1)    whether the factual circumstances supporting a departure are permissible departure factors;
>
> (2)    whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline

> heartland thus warranting a departure,
>
> (3)    whether the record sufficiently supports the factual basis
> underlying the departure, and
>
> (4)    whether the degree of departure is reasonable.
>
> United States v. Collins, 122 F.3d 1297, 1303 (10th Cir.1997).  We have described
> the first inquiry as a legal question and the second as essentially a factual question.
> Id.  We note that what constitutes a guideline's heartland is a legal question and our
> review on that question is not deferential.  Id. at 1303 n.4.

425 F.3d at 911-12.  The Tenth Circuit recognized that family circumstances are a discouraged

factor under the Guidelines and "are not ordinarily relevant in determining whether a sentence

should be outside the applicable guideline range," unless the circumstances are present in "'some

unusual or exceptional way.'"  United States v. Serrata, 425 F.3d at 913 (quoting United States v.

Reyes-Rodriguez, 344 F.3d 1071, 1074 (10th Cir. 2003).  See United States v. Marquez-Olivas,

172 F. App'x 855 (10th Cir. 2006)(indicating that "only in extraordinary circumstances may a

defendant's cultural assimilation warrant" a departure from the Guideline range); United States v.

Bautista, 258 F.3d 602, 607 (7th Cir. 2001)(concluding that a downward departure on the grounds

of cultural assimilation "would be akin to one based on 'family ties' -- a discouraged factor that is

grounds for departure only in extraordinary circumstances").  The United States Court of Appeals

for the Ninth Circuit came to a similar conclusion in United States v. Lipman, 133 F.3d 726 (9th

Cir. 1998).  In that case, the Ninth Circuit held that "a sentencing court may depart on the basis of

cultural assimilation if it finds that the defendant's circumstances remove his case from the

heartland of cases governed by the relevant individual guidelines and the Guidelines as a whole."

133 F.3d at 731.

> Moreover, the factor of cultural assimilation is akin to the factor of "family
> and community ties" discussed under U.S.S.G. § 5H1.6.  Thus, to the extent that
> cultural assimilation denotes family and community ties, we hold that the district
> court has the authority to depart on this basis in extraordinary circumstances.  Under

U.S.S.G. § 5H1.6, "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.6. But under U.S.S.G § 5K2.0, such circumstances may be relevant if "present to an unusual degree" such that the case is distinguished "from the 'heartland' cases . . . in a way that is important to the statutory purposes of sentencing." U.S.S.G. § 5K2.0. See United States v. Mondello, 927 F.2d 1463, 1470 (9th Cir. 1991)(holding that a court may rely on factors listed in U.S.S.G. § 5H1.6 to justify a departure "in extraordinary circumstances"). Whether a defendant's family and community ties are sufficiently "unusual" or "extraordinary" to warrant departure in a particular case is a factual determination that also lies within the discretion of the district court. [United States v. Koon, 518 U.S. 81, 98 (1996)]. See U.S.S.G. § 5K2.0 ("Presence of any such factor may warrant departure . . . , under some circumstances, in the discretion of the sentencing court.").

United States v. Lippman, 133 F.3d at 731. The application notes to U.S.S.G. § 2L1.2 that became effective on November 1, 2010, contain a statement regarding departure based on cultural assimilation. They state, in part:

> There may be cases in which a downward departure may be appropriate on the basis of cultural assimilation. Such a departure should be considered only in cases where (A) the defendant formed cultural ties primarily with the United States from having resided continuously in the United States from childhood, (B) those cultural ties provided the primary motivation for the defendant's illegal reentry or continued presence in the United States, and (C) such a departure is not likely to increase the risk to the public from further crimes of the defendant.

> In determining whether such a departure is appropriate, the court should consider, among other things, (1) the age in childhood at which the defendant began residing continuously in the United States, (2) whether and for how long the defendant attended school in the United States, (3) the duration of the defendant's continued residence in the United States, (4) the duration of the defendant's presence outside the United States, (5) the nature and extent of the defendant's familial and cultural ties inside the United States, and the nature and extent of such ties outside the United States, (6) the seriousness of the defendant's criminal history, and (7) whether the defendant engaged in additional criminal activity after illegally reentering the United States.

U.S.S.G. § 2L1.2, Application Note 9.

In United States v. Hernandez-Del Villar, 785 F.Supp.2d 986 (D.N.M. 2011)(Browning, J.), the Court refused to depart downward when the defendant came to the United States when he

was fifteen and when he had two teenage children and two grandchildren in the United States.  See 785 F. Supp. 2d at 988.  The Court reasoned that, while a downward departure was authorized, the defendants' circumstances did not "take him outside the heartland of cases that" the Court sees on a regular basis, especially because the defendants "came to the United States when he was fifteen, and his parents did not bring him here."  785 F.Supp.2d at 988.  In contrast, the Court granted a downward departure in United States v. Ochoa-Arrieta, No. CR 11–2149 JB, 2012 WL 1596939 (D.N.M. Apr.23, 2012)(Browning, J.), the Court granted a downward departure when the defendants' mother brought him to the United States when he was three, he attended public school in the United States for eleven years, English was his primary language, and all of his close family lived in the United States.  See 2012 WL 1596939, at *4.

## LAW REGARDING THE GUIDELINES

In United States v.  Booker, 543 U.S.  220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub.  L.  No.  98-473, 98 Stat.  1976, thus making the Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v.  Booker, 543 U.S.  at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)      to afford adequate deterrence to criminal conduct;

(C)      to protect the public from further crimes of the defendant; and

(D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

[A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense's nature and the nature of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.   See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due

consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)). A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251, n.3 (10th Cir. 2008). This presumption, however, is an appellate presumption, and not one that the trial court can or should apply. See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351. Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[4] Guidelines sentence. See Rita v. United States, 551 U.S. at 351; Gall v. United States,

---

[4]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory. Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See

552 U.S. at 46-47; <u>Kimbrough v. United States</u>, 552 U.S. at 90-91.

      While the Supreme Court's decision in <u>United States v. Booker</u> has given the

---

<u>United States v. Sierra-Castillo</u>, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-<u>Booker</u> have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). <u>Accord</u> <u>United States v. Chavez-Rodarte</u>, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

> The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).
>
> . . . .
>
> The Supreme Court held in <u>United States v. Booker</u> that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in <u>Kimbrough v. United States</u> that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their <u>United States v. Booker</u>-granted authority to post-Guidelines analysis "variances." <u>Irizarry v. United States</u>, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. <u>See</u> <u>Gall v. United States</u>, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, <u>such as failing to calculate (or improperly calculating) the Guidelines range</u>, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

<u>United States v. Nolf</u>, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

> sentencing court discretion that it did not have earlier, the sentencing court's first
> task remains to accurately and correctly determine the advisory-Guideline
> sentence. Thus, before the sentencing court takes up a defendant's <u>Booker</u> arguments, the
> sentencing court must first determine whether the defendant is entitled to downward
> departures.  The sentencing court may, however, also use these same departure
> factors in the <u>Booker</u> calculus, even if the court does not grant a downward
> departure.

<u>United States v.  Apodaca-Leyva</u>, No.  CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M.  Feb.

13, 2008)(Browning, J.).  The Supreme Court has recognized, however, that sentencing judges are

"in a superior position to find facts and judge their import under § 3553(a) in each particular case."

<u>Kimbrough v.  United States</u>, 552 U.S.  at 89.  Applying § 3553(a)'s factors, the Court has

concluded that the case of an illegal immigrant who re-entered the United States to provide for his

two children and two siblings was not materially different from other re-entry cases, and, thus, no

variance from the Guidelines sentence was warranted.  <u>See United States v.  Almendares-Soto</u>,

No.  CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M.  Dec.  14, 2010)(Browning, J.).  On the

other hand, in <u>United States v.  Jager</u>, No.  CR 10-1531 JB, 2011 WL 831279 (D.N.M.  Feb.  17,

2011)(Browning, J.), although the defendant's military service was not present to an unusual

degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate,

because the defendant's military service was "superior and uniformly outstanding," as the

defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."

2011 WL 831279, at *14.

## LAW REGARDING DOWNWARD DEPARTURES

The Guidelines "place essentially no limit on the number of potential factors that may

warrant a departure."  <u>Koon v. United States</u>, 518 U.S. 81, 106 (1996). <u>See United States v.

Coleman</u>, 188 F.3d 354, 358 (6th Cir. 1999)(en banc)(stating that there are a "potentially infinite

number of factors which may warrant a departure"); 18 U.S.C. § 3661 (stating that "[n]o limitation

shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence").  A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline." Koon v. United States, 518 U.S. at 92.  Accord United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

For example, in United States v. Jim, 877 F. Supp. 2d 1018 (D.N.M. 2012)(Browning, J.), the Court did not grant a defendant's request for a downward departure under U.S.S.G. § 4A1.3(b), where the defendant argued that his criminal history category over-represented the seriousness of his criminal history and the likelihood that he would commit other crimes.  See 877 F. Supp. 2d at 1044-45.  The Court noted that Jim's criminal history included: (i) two DWI convictions; (ii) a conviction for Roadway Laned Traffic; and (iii) Abandonment or Abuse of a Child.  See 877 F. Supp. 2d at 1044-45. The Court concluded that a criminal history category of II did not over-represent Jim's criminal history, explaining that Jim's previous convictions involved alcohol and driving, demonstrating a pattern of aberrant use of alcohol also seen in the offense for which he was sentenced -- sexual assault -- as Jim asserted that both he and the victim were intoxicated at the time he assaulted the victim.  See 877 F. Supp. 2d at 1022-23, 1044-45.  The Court noted that it "does not take much for a defendant to qualify for a criminal history category of II" and that the

Court could not distinguish Jim's criminal history from that of other defendants that the Court regularly sees who also have a criminal history category of II, and thus denied Jim's request for a downward departure under U.S.S.G. § 4A1.3. 877 F. Supp. 2d at 1044-45.

In United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), the Court denied a defendant's request for a downward departure, under U.S.S.G. § 5H1.11, based upon the defendant's eleven years of military service. See 2011 WL 831279, at *3. Even though Jager had received exemplary reviews in his performance reports, earning either the highest or second highest ratings possible, during his military career, the Court concluded that his service was not present in an unusual degree or distinguishable from other cases which the Guidelines cover. The Court noted that in many child pornographies cases, such as Jager's, the defendant leads an exemplary life publicly, while engaging in a sordid secret life privately. Jager's case was thus not distinguishable from other defendants sentenced under the Guidelines. Additionally, Jager was not in intense combat during his military career, most of his time was spent in the support role of a mechanic. The Court concluded, thus, that Jager's military service did not distinguish his case from those of many other defendants who commit child pornography, and the Court denied Jager's request for a downward departure. See 2011 WL 831279, at *10-11.

## LAW REGARDING VARIANCES FROM THE SENTENCING GUIDELINES

After United States v. Booker, 543 U.S. 220 (2005), the sentencing guideline ranges are now advisory and are one of several factors set out in 18 U.S.C. § 3553(a). Although appellate courts are allowed to assume that within-guidelines sentences are reasonable, subject to rebuttal, see Gall v. United States, 552 U.S. 38, 50-51 (2007), the Supreme Court has made it clear that no presumption of reasonableness attaches at the district court level to the sentence the Guidelines

suggest, see Gall v. United States, 552 U.S. at 50 (explaining that a sentencing judge "may not presume that the Guidelines range is reasonable"); Rita v. United States, 551 U.S. 338, 351 (2007)("In determining the merits of [the parties'] arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D). Section 3553(a) also directs sentencing courts to consider: (i) the nature of the offense and the defendant's character; (ii) the available sentences; (iii) the Sentencing Guidelines and policy statements that the Sentencing Commission has promulgated; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1), (3)-(7).

## ANALYSIS

In the Objections, Arevalo-Contreras asks that the "Court grant a downward departure or variance and sentence him to a term of imprisonment of 18 months . . . ." Objections at 1. The Court will not grant a downward departure nor vary downward, because: (i) a Criminal History Category of IV is appropriate; (ii) the U.S.S.G. § 2L1.2 enhancements are appropriate in this case; and (iii) downward departures are not warranted based on cultural assimilation or age. The Court

imposes a sentence of 37 months, at the high end of the Guideline range, because this sentence is sufficient, but not greater than necessary, to comply with the § 3553(a) factors.  Specifically, Judge Gonzales gave Arevalo-Contreras a sentence of 70 months – a bottom of the Guideline range sentence in 2014 -- and the Court concludes that this is still a Guideline range case, but the sentence should be at the top of the range, because a much higher sentence for the same crime has not deterred Arevalo-Contreras from illegally reentering the country.

I.   **THE COURT WILL NOT REDUCE THE CRIMINAL HISTORY CATEGORY FROM IV TO II, BECAUSE A CRIMINAL HISTORY SCORE OF IV ACCURATELY REPRESENTS AREVALO-CONTRERAS' CRIMINAL HISTORY.**

Arevalo-Contreras insists that, because both violent offenses counted in his criminal history score occurred when he was eighteen years old, they skew inappropriately his criminal history score.  See Objections at 3.  The Court would be more inclined to agree with this argument had Arevalo-Contreras been an upstanding citizen since he committed the two violent felonies. Instead, Arevalo-Contreras has demonstrated repeatedly a tendency to engage in criminal activity shortly after being released from incarceration.  Arevalo-Contreras was deported on February 15, 2011.  See PSR ¶ 27, at 6.  Two-and-a-half years later, he again illegally reentered the United States.  See PSR ¶ 28, at 7.  Following his prison sentence for illegal reentry, Arevalo-Contreras was deported on April 2, 2019.  See PSR ¶ 28, at 7.  Arevalo-Contreras again re-entered the United States some time during 2019.  See PSR ¶ 49, at 10.

While present in the United States, Arevalo-Contreras maintained membership in the Juaritos Maravilla gang and engaged in other illegal activity, including selling crack and methamphetamine, and illegally possessing a firearm.  See Juarez to Albuquerque (depicting Arevalo-Contreras discussing drug sales and holding a firearm).  Moreover, it is difficult for

Arevalo-Contreras to argue that he has not committed a violent crime since he was eighteen, because Arevalo-Contreras has "been incarcerated so much during that time, we really don't know what he would have been doing during that time if he hadn't been incarcerated so much."  Tr. at 27:21-23 (Court).  A criminal history category of IV is also "not the highest . . . it's not a six."  Tr. at 27:24-28:1 (Court).  Despite the age of some of the convictions included in the criminal history calculations, a criminal history category of IV does not over-represent Arevalo-Contreras' likely future criminal activity, because, as the Court has noted, "the video" -- Juarez to Albuquerque -- "is very troubling, it seems to be recent, and I just don't have confidence that he's not going to engage in criminal activity . . . .  I think that a Criminal History Category of IV is accurate because I don't think he's persuaded me he's not going to engage in criminal activity."  Tr. at 28:9-17 (Court).  In sum, a downward departure in criminal history is not appropriate, because a Criminal History category of IV is "a fairly good representation" of Arevalo-Contreras' criminal history. Tr. at 28:15-19 (Court).

## II.   THE COURT WILL APPLY THE ENHANCEMENT UNDER U.S.S.G. § 2L1.2(B)(2)(C), BECAUSE THE GUIDELINES AUTHORIZE THE USE OF AREVALO-CONTRERAS' PRIOR CONVICTIONS TO CALCULATE BOTH HIS OFFENSE LEVEL ENHANCEMENT AND HIS CRIMINAL HISTORY SCORE .

In the PSR, the USPO calculates Arevalo-Contreras' base offense level as 8.  See PSR ¶ 11, at 4.  The USPO applies an enhancement under § 2L1.2(b)(1)(A), because "the defendant committed the instant offense after sustaining a conviction for a felony illegal reentry offense; therefore, a four-level increase is warranted."  PSR ¶ 12, at 4.  The USPO also applies an enhancement under § 2L1.2(b)(2)(C), because, "[b]efore the defendant was ordered deported from the United States for the first time, the defendant was convicted for a felony offense (other than an illegal reentry offense). . . . [T]herefore, a six-level increase is warranted."  PSR ¶ 13, at 4.

Section 2L1.2(b) provides, in relevant part:

> **(b)**    Specific Offense Characteristics:
>
> > **(1)**    (Apply the Greater) If the defendant committed the instant offense after sustaining--
> >
> > > **(A)**    a conviction for a felony that is an illegal reentry offense, increase by 4 levels; or
> >
> > . . . .
> >
> > **(2)**    (Apply the Greatest) If, before the defendant was ordered deported or ordered removed from the United States for the first time, the defendant engaged in criminal conduct that, at any time, resulted in --
> >
> > . . . .
> >
> > > **(C)**    a conviction for a felony offense (other than an illegal reentry offense) for which the sentence imposed exceeded one year and one month, increase by 6 levels;

U.S.S.G. § 2L1.2(b) (bold in original).  Both enhancements apply and are appropriate in this case, because the Guidelines reasonably use prior convictions to calculate both criminal history and sentencing enhancements in illegal reentry cases.

Arevalo-Contreras argues that the "Court should reject the Section 2L1.2(b)(2) enhancement in its entirety because the prior conviction is counted in the criminal history score." Objections at 4.  The Commentary to U.S.S.G. § 2L1.2, however, addresses this issue: "A conviction taken into account under subsection (b)(1), (b)(2), or (b)(3) is not excluded from consideration of whether that conviction receives criminal history points pursuant to Chapter Four, Part A (Criminal History)."  U.S.S.G. § 2L1.2 cmt. 3.  Moreover, the Tenth Circuit has "routinely upheld as reasonable the use of prior convictions to calculate both the criminal history category and a sentence enhancement where, as here, the Guidelines authorize it."  <u>United States v. Ruiz-</u>

Terrazas, 477 F.3d 1196, 1204 (10th Cir. 2007)(collecting cases). Accordingly, the Court concludes that "U.S.S.G. § 2L1.2(b) permits the double counting of a prior conviction for the purpose of both applying" an "enhancement and calculating a defendant's criminal history." United States v. Soto-Lopez, 513 F. App'x 746, 749 (10th Cir. 2013).

      Arevalo-Contreras also contends that the Court should not apply the enhancement, because, under Kimbrough v. United States, 552 U.S. at 109, "2L1.2(b)'s enhancement scheme based on prior convictions is not based on empirical research, [and] applying it results in a procedurally unreasonable sentence." Objections at 7. Instead, Arevalo-Contreras contends that the enhancement is a "response to Congressional directive and complaints from practitioners," and has not been "justified . . . with recidivist data or with any other empirical evidence." Objections at 6. The United States does not address this argument in its Response. See Response at 4. Arevalo-Contreras' "argument that the enhancement is too high and not empirically based is not a challenge to the district court's exercise of discretion but a challenge to the Guideline itself." United States v. Irazoqui-Leyva, 399 F. App'x 337, 339-40 (10th Cir. 2010).

      Even if the Sentencing Commission had not considered empirical evidence, Arevalo-Contreras' argument that there is

> no reliable empirical evidence that supports the . . . Sentencing Commission's conclusion that longer sentences are likely to deter repeat offenses . . . is barred by the judgment of Congress that, under § 3553(a), courts "must consider not only the crime's seriousness and the need for just punishment, but also *the need to deter the defendant* and others." *United States v. Walker*, 844 F.3d 1253, 1257 (10th Cir. 2017)(emphasis added). We recognize that some studies have been interpreted to show that harsher penalties add little deterrence value. But courts have never been bound by such studies, which have not always stood the test of time.

United States v. Martinez-Palomino, 775 F. App'x 423, 427 (10th Cir. 2019)(emphasis in United States v. Martinez-Palomino). The Court concludes that the Sentencing Commission has

continuously adapted the Guidelines surrounding illegal reentry by tweaking their harshness to maximize deterrence and minimize recidivism.

Moreover, the Court concludes that Arevalo-Contreras' argument that empirical research does not underly § 2L1.2(b)'s enhancement scheme is incorrect.  See Illegal Reentry Offenses at 1-32,         United         States         Sentencing         Commission         (April 2015), https://www.ussc.gov%2Fresearch%2Fresearch-publications%2Fillegal-reentry-offenses &usg=AOvVaw3HYYe_AjlKCUHCQYOzblyO ("Illegal Reentry Report").  In the Notes to the 2016 Amendments to § 2L1.2, the Sentencing Commission cites its 2015 Illegal Reentry Offenses Report.  Regarding its adjustment to the enhancement provision, the Sentencing Commission explains:

> The amendment also addresses another frequent criticism of the existing guideline -- that its use of a single predicate conviction sustained by a defendant before being deported or removed from the United States to impose an enhancement of up to 16 levels is often disproportionate to a defendant's culpability or recidivism risk. The Commission's data shows an unusually high rate of downward variances and departures from the guideline for such defendants. For example, the Commission's report found that less than one-third of defendants who qualify for a 16-level enhancement have received a within-range sentence, while 92.7 percent of defendants who currently qualify for no enhancement receive a within-range sentence.  Illegal Reentry Report, at 11.

> The lengths of the terms of imprisonment triggering each level of enhancement were set based on Commission data showing differing median sentence lengths for a variety of predicate offense categories.  For example, the Commission's data indicated that sentences for more serious predicate offenses, such as drug-trafficking and felony assault, exceeded the two-and five-year benchmarks far more frequently than did sentences for less serious felony offenses, such as drug possession and theft.  With respect to drug-trafficking offenses, the Commission found that 34.6 percent of such offenses received sentences of between two and five years, and 17.0 percent of such offenses received sentences of five years or more.  With respect to felony assault offenses, the Commission found that 42.1 percent of such offenses received sentences of between two and five years, and 9.0 percent of such offenses received sentences of five years or more.  With respect to felony drug possession offenses, 67.7 percent of such offenses received sentences of 13 months or less, while only 21.3 percent received

sentences between two years and five years and only 3.0 percent received sentences of five years or more.  With respect to felony theft offenses, 57.1 percent of such offenses received sentences of 13 months or less, while only 17.4 percent received sentences between two years and five years and only 2.0 percent received sentences of five years or more.

The Commission considered public comment suggesting that the term of imprisonment a defendant actually served for a prior conviction was a superior means of assessing the seriousness of the prior offense.  The Commission determined that such an approach would be administratively impractical due to difficulties in obtaining accurate documentation.  The Commission determined that a sentence-imposed approach is consistent with the Chapter Four criminal history rules, easily applied, and appropriately calibrated to account for the seriousness of prior offenses.

U.S.S.G. § 2L1.2 2016 Amendment Notes.   The Amendment Notes demonstrate that the Sentencing Commission conducted research into the impacts of U.S.S.G. § 2L1.2, analyzed that research when it decided to lower the enhancements under § 2L1.2, and considered public comment on U.S.S.G. § 2L1.2.  When the Sentencing Commission sought public comment on the 2016 Amendments to U.S.S.G. § 2L1.2, the Sentencing Commission noted that it was "informed by the Commission's recent report on offenders sentenced under § 2L1.2 (Unlawfully Entering or Remaining in the United States)" and summarized the Illegal Reentry Report's key findings. See United States Sentencing Commission, Federal Register Notice: Proposed 2016 Amendments, Request for Comment at 65-66 (2016), https://www.ussc.gov/sites/default/files/20160115_FR_Proposed_Amendment.pdf.   ("Notice: Proposed 2016 Amendments").  Contrary to Arevalo-Contreras' assertions, see Objections at 4, the Sentencing Commission considered illegal reentry offenders' recidivism rates, see Notice: Proposed 2016 Amendments at 66. Accordingly, the Court concludes that the Sentencing Commissions' amendments to U.S.S.G. § 2L1.2 satisfy Kimbrough v. United States and apply to Arevalo-Contreras' sentence.

- 38 -

III.   **AREVALO-CONTRERAS IS NOT ELIGIBLE FOR A DOWNWARD DEPARTURE BASED ON CULTURAL ASSIMILATION, BECAUSE A DOWNWARD DEPARTURE WOULD ENDANGER THE PUBLIC, AND BECAUSE AREVALO-CONTRERAS RE-ENTERED THE UNITED STATES FOR SELF-PROTECTION.**

Arevalo-Contreras asks the Court to grant "downward departure or variance based on cultural assimilation based on Application Note 8 to U.S.S.G. § 2L1.2." Objections at 7. The Application Note states:

> **Departure Based on Cultural Assimilation. --** There may be cases in which a downward departure may be appropriate on the basis of cultural assimilation. Such a departure should be considered only in cases where (A) the defendant formed cultural ties primarily with the United States from having resided continuously in the United States from childhood, (B) those cultural ties provided the primary motivation for the defendant's illegal reentry or continued presence in the United States, and (C) such a departure is not likely to increase the risk to the public from further crimes of the defendant.
>
> In determining whether such a departure is appropriate, the court should consider, among other things, (1) the age in childhood at which the defendant began residing continuously in the United States, (2) whether and for how long the defendant attended school in the United States, (3) the duration of the defendant's continued residence in the United States, (4) the duration of the defendant's presence outside the United States, (5) the nature and extent of the defendant's familial and cultural ties inside the United States, and the nature and extent of such ties outside the United States, (6) the seriousness of the defendant's criminal history, and (7) whether the defendant engaged in additional criminal activity after illegally reentering the United States.

U.S.S.G. § 2L1.2 cmt. 8 (bold in original).

Regarding the first factor, Arevalo-Contreras "moved from Chihuahua, Mexico to Albuquerque, New Mexico when he was around eight or nine years old." PSR ¶ 39, at 8. Second, Arevalo-Contreras attended school in Albuquerque for approximately five to six years, but "dropped out in the ninth grade because he had to earn money for his household as his mother was struggling to pay the bills." PSR ¶ 48, at 10. Regarding factors three and four, Arevalo-Contreras has resided for longer in the United States than he has in Mexico, but spent almost all of his time

as an adult in the United States incarcerated.  See PSR ¶ 28, at 7.  As to factor five,  Arevalo-Contreras has extensive familial ties in the United States: Arevalo-Contreras' wife, parents, and siblings reside in the United States.  See PSR ¶ 68, at 14; Objections at 8.  There is no evidence that Arevalo-Contreras has any familial ties in Mexico.  In fact, "because of his family's legal status in the United States he was captured and tortured by the Mexican cartel.  He was in fear for his life, and this was his primary motivation to return to the United States after his last deportation."  PSR ¶ 68, at 14.  Regarding the sixth factor, Arevalo-Contreras has a significant criminal history.  PSR ¶ 68, at 14.  He has admitted "to being a member of the Juaritos Mara Villa gang."  PSR ¶ 68, at 14.  Further, before Arevalo-Contreras' "first removal from the United States he was convicted of an Aggravated Felony of Aggravated Battery (Great Bodily Harm)."  PSR ¶ 68, at 14.   He was also convicted of "battery upon a peace officer" when he "struck the officer during a physical confrontation."  PSR ¶ 27, at 6.  Arevalo-Contreras was "previously deported on February 15, 2011, and April 2, 2019."  PSR ¶ 68, at 14.  Arevalo-Contreras has admitted to selling drugs and carries a firearm in a recent video, despite his status as a felon.  See Response at 3, n.1; Juarez to Albuquerque.  Arevalo-Contreras also sustained juvenile convictions, including "shooting at or from a motor vehicle (causing injury)," and "unlawful possession of a handgun by a minor."  PSR ¶¶ 24-25, at 5-6.  Regarding the seventh factor,  while Arevalo-Contreras has not been convicted of any crimes since re-entering the United States following his February, 2019, deportation, the July, 2020, video shows him carrying a firearm despite his status as a felon.  See Juarez to Albuquerque at 2:33.  In sum, the factors weigh against granting a downward departure based on cultural assimilation in this case, because, although  Arevalo-Contreras spent his childhood in the United States and has family in the United States, he has a significant criminal history and continues to disregard the law.  See U.S.S.G. § 2L1.2 cmt. 8.

The Court will consider a downward departure based on cultural assimilation only in cases where U.S.S.G. § 2L1.2 Application Note 8's three requirements are met.  Although Arevalo-Contreras satisfies the first requirement, he does not satisfy the remaining two requirements, so the Court will deny his request for a downward departure.  First, Arevalo-Contreras "formed cultural ties primarily with the United States from having resided continuously in the United States from childhood" because: (i) he moved to the United States when he was approximately eight years old; (ii) his wife, parents, and siblings reside in the United States; and (iii) he has no familial ties in Mexico.  U.S.S.G. § 2L1.2 cmt. 8.  Arevalo-Contreras' cultural ties to the United States, however, did not provide "the primary motivation for the defendant's illegal reentry or continued presence in the United States."  U.S.S.G. § 2L1.2 cmt. 8.  Instead, Arevalo-Contreras returned to the United States primarily because, after his 2019 deportation to Mexico, the Mexican cartel captured and tortured him.  See PSR ¶ 68, at 14.  At the hearing, although he did not mention this in the briefing, Arevalo-Contreras' counsel, Mr. Langell, asserted that Arevalo-Contreras "came back to seek family support . . . .  It's not necessarily true that the reason he returned was primarily to avoid being harmed down in Mexico."  Tr. at 21:25-22:3 (Langell).  Yet, moments later, Arevalo-Contreras, speaking on his own behalf, reiterated that he had returned to the United States to seek asylum because of the Mexican cartel.  See Tr. at 34:9-17 (Arevalo-Contreras).  Moreover, Arevalo-Contreras met his current wife since returning to the United States after his 2019 deportation; therefore, his wife did not play a role in his decision to come back to the United States. See PSR ¶ 42, at 9.  The Court, therefore, is confident in its conclusion that persecution by the Mexican cartel, rather than family ties, motivated primarily Arevalo-Contreras' return to the United States in 2019.

Last, the Court is concerned that a downward departure would "increase the risk to the

public from further crimes of the defendant," because Arevalo-Contreras continued to disregard United States law after unlawfully re-entering in 2019.[5]  U.S.S.G. § 2L1.2 cmt. 8.  First, in the Juarez to Albuquerque video, Arevalo-Contreras states that, while in Albuquerque, he sold drugs. See Juarez to Albuquerque at 5:20.  Although Arevalo-Contreras does not indicate the exact time period in which he sold drugs in Albuquerque, the Court concludes, by a preponderance of the evidence, that Arevalo-Contreras sold drugs, including crack, after returning to the United States following his 2019 deportation. Arevalo-Contreras was incarcerated in the United States beginning on February 19, 2009, when he was eighteen, until February 15, 2011, when he was twenty, and was deported immediately following this incarceration period on February 15, 2011.  See PSR ¶ 27, at 6.  He then was arrested at the border upon his attempt to reenter the United States on November 17, 2013, at age twenty-two, and was again deported on April 2, 2019, following immediately after serving a prison sentence for the illegal reentry.  See PSR ¶ 68, at 14.  He then reentered the United States some time in 2019.  See PSR ¶ 68, at 14.  In Juarez to Albuquerque, Arevalo-Contreras states that when "I came back to Albuquerque, I started . . . receiving dope . . . .  I remember I used to sell crack and my homie used to hook me up," indicating that he was not a juvenile while selling drugs, because Arevalo-Contreras was consistently in the United States and the Albuquerque area between ages eight and eighteen and would not have "c[o]me back" to Albuquerque.  Arevalo-Contreras also states that, during the time when he was selling drugs he was "wild, clubbing," suggesting that he was not incarcerated during this time period, given that he was able to visit nightclubs.  See Juarez to Albuquerque at 5:20.  Accordingly,

---

[5]While, in the old days, Arevalo-Contreras would be deported after serving his federal sentence, his immigration status is less clear with the current administration [explain what Biden/DOJ is doing and not deporting people. . . and the Court cannot assume that he will be deported and, if he is, whether he will stay there, making his need to

Arevalo-Contreras' statements in <u>Juarez to Albuquerque</u>, and the time periods related to his incarceration and deportations, lead the Court to conclude, by a preponderance of the evidence, that Arevalo-Contreras sold crack following his return to the United States in 2019 or 2020, because this period is the only time in which Arevalo-Contreras was present in the United States as an adult and was not incarcerated.  Moreover, Arevalo-Contreras was filmed carrying a firearm in the United States in 2020, although Arevalo-Contreras has multiple felony convictions.  <u>See</u> <u>Juarez to Albuquerque</u> at 2:30.  The Court therefore concludes that a downward departure in this case could endanger the public, because, despite serving over six years in custody from 2013 to 2019, Arevalo-Contreras has continued to violate the law.  Considering the danger to the public, and because Arevalo-Contreras did not return to the United States primarily to be with family, but instead did so primarily for self-protection, a downward departure based on cultural assimilation is inappropriate.   Moreover, even if the downward departure for cultural assimilation is appropriate, the Court would exercise its discretion not to depart, because Arevalo-Contreras is not a person whom the United States wants in the country; he has not been a good resident.  <u>See</u> From Juarez to Albuquerque; PSR ¶¶ 24-30, at 4-7.

**IV.    THE COURT WILL NOT DEPART DOWNWARD BECAUSE OF AREVALO-CONTRERAS' AGE, BECAUSE AREVALO-CONTRERAS IS THIRTY YEARS OLD AND HIS AGE DOES NOT MAKE HIM <u>UNLIKELY TO RECIDIVATE</u>.**

Arevalo-Contreras asks the Court to depart downward under U.S.S.G. § 5H1.1.  <u>See</u> Objections at 9.  The applicable Policy Statement reads:

> Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.  Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

U.S.S.G. § 5H1.1.  Arevalo-Contreras argues that, because he is thirty years old, he is "less likely

to recidivate because of his age" and emphasizes that the Sentencing Commission "has observed

that recidivism rates decline relatively consistently as age increases."  Objections at 9.  The

Sentencing Commission's report on reentry of removed alien, however, states that the average age

of a reentry offender is thirty-six.  See Illegal Reentry Report at 13.  Arevalo-Contreras' age, thirty-

years old, therefore, does not "distinguish the case from the typical case covered by the guidelines."

U.S.S.G. § 5H1.1.  See United States v. Rivera, No. 15-CR-1020-MV, 2017 WL 3412101, at *3

(D.N.M. Mar. 17, 2017)(Vasquez, J.)(declining to depart downward on 5H1.1's basis where the

defendant was forty years old); United States v. Gutierrez, No. 10-CR-3383 WJ, 2013 WL

12329917, at *1 (D.N.M. Aug. 23, 2013)(Johnson, J.)(refusing to depart downward for a sixty-

five-year-old defendant who was in fair physical health).  See also United States v. Varela, 499

F. App'x 822, 824 (10th Cir. 2012)(denying a certificate of appealability where the defendant

argued that the lower court erred in concluding that "60 is not a sufficient age to warrant a

downward departure and that Defendant's spinal stenosis, back surgery, and disc fusion are not

that uncommon and could be accommodated in prison").  A downward departure based on age

may be warranted in an unusual case for an elderly defendant "who will have a lower rate of

recidivism and who may be too physically feeble to commit more crimes."  United States v.

Gonzalez-Lopez, No. CR 11-3002 JB, 2012 WL 3150350, at *8 (D.N.M. July 27,

2012)(Browning, J.).  By contrast, here, Arevalo-Contreras' age does not make him less likely to

recidivate, and he is in good physical health.  See PSR ¶ 44, at 9.  In sum, this case and Arevalo-

Contreras' age fall within the heartland of reentry cases the Court sees on a regular basis.

Accordingly, the Court will not depart downward on the basis of U.S.S.G. § 5H1.1.

**V.     A SENTENCE OF 37 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN**

**NECESSARY, TO SATISFY § 3553(A)'S FACTORS.**

Arevalo-Contreras' Guideline imprisonment range is 30 to 37 months, and the Court concludes that a sentence at the high end of the Guidelines is necessary to satisfy § 3553(a). In general, there are not "a lot of factors that put downward pressure" to take it out of the Guideline range but the Court sees "many factors that put upward pressure" on Arevalo-Contreras' sentence to keep it in the Guideline range. Tr. at 41:10-12 (Court). The Court's rationales for overruling Arevalo-Contreras' Objections also apply to the § 3553(a) factors. See United States v. Alapizco-Valenzuela, 546 F.3d 1208, 1222 (10th Cir. 2008)(explaining that "district courts have broad discretion to consider particular facts in fashioning a sentence under 18 U.S.C. § 3553(a), even when those facts are already accounted for in the advisory Guidelines range"). The statute instructs courts to consider the following factors when imposing a sentence:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed --

     (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     (B)     to afford adequate deterrence to criminal conduct;

     (C)     to protect the public from further crimes of the defendant; and

     (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established for --

     (A)     the applicable category of offense committed by the applicable category of defendant as set forth in the

guidelines --

    (i)        issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

    (ii)      that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

  (B)    in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5)    any pertinent policy statement --

  (A)    issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

  (B)    that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7).

Regarding § 3553(a)(1), the Court "notes the defendant illegally reentered the United

States after having been previously deported following an aggravated felony conviction."  Tr. at 40:20-23 (Court).  Although the offense itself is nonviolent, Arevalo-Contreras has shown continued disrespect for the law since he was very young, see PSR ¶ 33, at 7, until he was arrested for the offense for which the Court is sentencing Arevalo-Contreras, including by carrying a firearm despite his felon status, see From Juarez to Albuquerque at 2:30.  Moving to § 3553(a)(2), the Court concludes that a 37-month sentence is adequate but also necessary to "reflect seriousness of the offense, promote respect for the law, provide just punishment and," most importantly for the Court in this case, "afford adequate deterrence both at a specific and generally level."  Tr. at 41:12-18 (Court).  Judge Gonzales' 70-month sentence for illegal reentry in 2014 -- which, at the time, was a low-end Guideline sentence -- did not deter Arevalo-Contreras from reoffending and from returning to the United States, where he continued to engage in criminal activity.  Tr. at 41:21-25 (Court).  Thus, although the Court normally does not impose a sentence at the top of the Guideline range, "in this situation we're talking about almost 50 percent of what he was given by Judge Gonzales, and it did not deter him."  Tr. at 42:2-12 (Court).  Bearing in mind Arevalo-Contreras' recent criminal activity depicted in the Juarez to Albuquerque video, the Court is also aware of the need to protect the public from Arevalo-Contreras, given that both the video and Arevalo-Contreras' criminal history are "very troubling."  Tr. at 42:13-14 (Court).

Regarding § 3553(a)(3), the Court could impose up to the statutory maximum penalty of twenty years, and at least get the sentence closer or above Judge Gonzales'.  See 8 U.S.C. § 1326(b)(2).  On the other hand, Judge Gonzales saw Arevalo-Contreras as a Guideline case, and the Court also sees this as a Guideline case, even though the Guidelines have changed in Arevalo-Contreras' favor.  Moreover, to avoid sentencing disparity among similar defendants, the Court will impose a sentence within the Guideline range.  See § 3553(a)(6); United States v.

Branson, 463 F.3d 1110, 1112 (10th Cir. 2006)(noting that imposing a sentence in the Guideline range promotes uniformity within the federal system).  Regarding § 3553(a)(4), the Guideline imprisonment range is 30 to 37 months and the Court is imposing a sentence within that range. See PSR ¶ 53, at 11  Section 3553(a)(5) is inapplicable here, because the Court has not identified any pertinent policy statements from the Sentencing Commission.  U.S.S.G. § 5H1.1 does not, as Arevalo-Contreras argues, weigh in favor of a downward variance, given that Arevalo-Contreras' age makes him likely to recidivate.  See Illegal Reentry Report at 13; Objections at 9.  Section 3553(a)(7) is also inapplicable here, because there is no restitution at issue.  Having considered carefully all of the factors described in 18 U.S.C. §  3553(a), the Court concludes that a 37-month sentence is "'sufficient, but not greater than necessary' to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2)."  United States v. Young, No. CR 17-0694 JB, 2021 WL 534869, at *24 (D.N.M. Feb. 11, 2021)(Browning, J.)(quoting 18 U.S.C. § 3553(a)). See United States v.  Almendares-Soto, 2010 WL 5476767, at *12 (concluding that, where the defendant illegally reentered the United States to care for his two children and two siblings, no variance was warranted because there was no material difference from other reentry cases). Accordingly, the Court sentences Arevalo-Contreras to 37 months.  This Guideline sentence is the Guideline sentence closest to the Guideline sentence that Judge Gonzales gave; the deterrence factor strongly suggests this sentence.

     **IT IS ORDERED** that the requests and objections in the Defendant's Motion for Downward Departure or Variance and Sentencing Memorandum, filed July 1, 2021 (Doc. 25), are denied and overruled.

UNITED STATES DISTRICT JUDGE

*Counsel*:

Fred Federici
  Acting United States Attorney
Letitia Carroll Simms
  Assistant United States Attorney
United State Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Margaret Katze
  Federal Public Defender
James N. Langdell
  Assistant Federal Public Defender
Federal Public Defender Office
Las Cruces, New Mexico

    *Attorneys for the Defendant*